UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

26 CR 190 DWF/EMB

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | **INDICTMENT** |
| v. | ) | 18 U.S.C. § 2<br>18 U.S.C. § 371<br>18 U.S.C. § 982(a)(7)<br>18 U.S.C. § 1035<br>21 U.S.C. § 853(p)<br>28 U.S.C. § 2461(c) |
| EMILY RAVITS, Defendant. | ) | |

**THE UNITED STATES GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

1. Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), was responsible for overseeing Medicaid in participating states, including Minnesota.

2. Individuals who received benefits under Medicaid were referred to as "recipients."

3. Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

LT SCANNED
OCT 22 2026
U.S. DISTRICT COURT MPLS

4. Each state, including Minnesota, established and administered its own Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5. Medicaid covered the costs of medical services and products ranging from routine preventative medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6. In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

7. Medicaid providers were required to meet certain requirements in order to participate in the Medicaid program, including billing and recordkeeping requirements. In Minnesota, these requirements were set forth in the Minnesota Health Care Programs ("MHCP") Provider Manual.

## A. The Minnesota Early Intensive Development and Behavior Intervention ("EIDBI") Program

8. Autism spectrum disorder ("ASD" or "autism") was a neurological and developmental disorder that affected how people interact with others, communicate, learn, and behave.

9. Applied Behavior Analysis, sometimes called "ABA therapy," was a type of one-on-one behavioral therapy designed to help children on the autism spectrum

develop social and emotional skills. ABA therapy sought to improve social skills by rewarding and reinforcing positive behavior while discouraging negative behavior.

10. The EIDBI program was a federally funded Minnesota health care program. According to the DHS website, the purpose of the EIDBI program was "to provide medically necessary, early and intensive intervention for people with ASD and related conditions."

11. The EIDBI program covered various treatment options, including ABA therapy, for persons diagnosed with ASD and related conditions.

12. The EIDBI benefit did not cover certain services, including: (i) services that were primarily for custodial, day care, or respite purposes that were not implemented as skill-building intervention within the person's individual treatment plan ("ITP"); (ii) services that were primarily recreational and not supervised by a medical professional (e.g., sports activities, craft activities, meal/snack time, trips to community activities, tours) if they were not primarily for treatment and provided according to the person's ITP; (iii) services provided by a parent, legal guardian, or another person who was legally responsible for the person who received services; and (iv) services provided by a person who has a relationship that violates ethical guidelines for dual relationship (e.g., sibling, cousin, aunt/uncle, personal care assistant worker) or would result in a conflict of interest, as defined by applicable ethical practice standards or licensure rules.

13. In order to qualify for the EIDBI program, a person must have been under 21 years old; have been diagnosed with ASD or a related condition; have had a

comprehensive multi-disciplinary evaluation ("CMDE") that established his or her medical need for EIDBI services; and have been enrolled in a qualifying health care program, such as Medicaid.

14. The CMDE was used to develop the person's ITP. An ITP was a personalized, written plan of care that outlined the goals for the person and set forth the specific interventions the person would receive based on his or her individually assessed needs.

15. EIDBI provider agencies were legal entities or individuals approved by Minnesota to provide EIDBI services.

16. EIDBI treatment services were required to be delivered under the supervision of a Qualified Supervising Professional ("QSP").

17. The QSP was required to be a physician, advanced practice registered nurse, developmental or behavioral pediatrician, licensed behavior analyst, or licensed mental health professional as defined under Minnesota law. EIDBI provider agencies were required to request an affiliation with a QSP at the time of enrollment with DHS and maintain an active affiliation to remain in compliance.

18. The QSP supervised and managed all aspects of EIDBI services, treatment, and documentation, including supervising the medical providers that actually provided services. The QSP assumed full professional responsibility for the services provided by each supervisee, including the supervisee's actions and decisions.

19. QSPs were required to sign an Assurance Statement for QSPs assuring that (a) they would "take full responsibility for all EIDBI services billed under [their] supervision," and (b) "all services under [their] supervision will be provided by qualified staff working in compliance with all applicable service standards, including standards described in the EIDBI policy manual."

20. The QSP was also required to be disclosed by EIDBI provider agencies as a managing employee on the Disclosure of Ownership and Control Interest of an Entity form or with both roles of managing employee and qualified professional on the Minnesota Provider Screening and Enrollment portal. DHS defined "managing employee" as a person other than the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Technology Officer who exercised operational or managerial control over, or who directly or indirectly conducted or managed the day-to-day operations, such as a general manager, business manager, administrator, or director.

21. According to the EIDBI policy manual, a QSP was required, among other things, to (a) ensure the ITP and all EIDBI services provided took into consideration the person's and family's values, goals, preferences, culture, and language; (b) determine with the parent/primary caregiver the level of parent/primary caregiver training and counseling provided; (c) develop, complete, monitor, approve, and sign the person's initial ITP and each updated ITP; (d) supervise, manage, and review all aspects of EIDBI services, treatment, and documentation (including case notes and incident reports) to ensure compliance and fidelity; and (e) supervise and oversee all

EIDBI services provided by providers (including billing, case notes, and other documentation).

22. As to ITPs specifically, a QSP was required to submit an ITP progress monitoring update after each six months of treatment to determine if the person was making progress toward targeted functional and generalizable goals specified in the ITP. Based on the results of ITP progress monitoring, the QSP was required to adjust the ITP as needed and document either that EIDBI services continue to be medically necessary for the person or recommend a transition or termination of EIDBI services.

23. A QSP's National Provider Identifier ("NPI") was listed on all claims for EIDBI services made by EIDBI provider agencies as the supervising NPI.

24. Level I and Level II providers oversaw the implementation of ITPs and worked with EIDBI client-patients. Providers participated in monitoring progress, goals, objectives, and treatment outcomes. All providers were responsible for documenting all services provided in case notes. Level I and Level II providers were required to meet certain, defined qualifications, including education and experience qualifications. The qualifications for Level I providers were more stringent than the qualifications for Level II providers.

25. The MHCP Provider Manual provided information specific to each category of enrolled provider, including EIDBI providers, who billed codes related to ABA therapy services for ASD, and QSPs.

26. EIDBI professionals, like other providers of services to Medicaid recipients through MHCP, were required to observe rules designed to ensure quality

of care, medical necessity, and the appropriate and accurate billing of services provided. Those requirements included the following:

a. Health Service Records. As a condition for payment, the provider was required to document each occurrence of a health service provided to a recipient. The health service was required to be documented in the recipient's health service record, and was required to include the following: the recipient's personal information and legal representative; the date on which the entry was made; the date or dates on which the health service was provided; contact information for the QSP; information about other services the person or legal representative received; the start and stop times and/or length of time spent with the recipient if the amount paid for the service depends on time spent; the signature and title of the person from whom the recipient received the service; completed and current CMDE; completed and current ITP; a plan for providing clinical supervision, observation, and direction to individual providers; and preferences of the parent(s) and/or caregiver(s) for EIDBI services, including their level of involvement.

b. Retention of Claims Records and Other Documentation. Providers were required to retain records, including all health service and financial records related to a health service for which payment under a program was received or billed, for at least five years after the initial date of billing. The retention requirement applied to a provider after withdrawal or termination from the program, and after a change of ownership.

c. Billing Procedures. EIDBI providers were required to follow DHS billing rules designed to ensure the submission of accurate and honest claims for reimbursement for services actually provided. The requirements regarding claims submission to DHS were set forth in the MHCP Provider Manual and included the following:

i. Billing for Services Actually Provided. Providers who contracted with DHS agreed to bill for services actually provided. Providers submitted claims to DHS electronically and under a recipient's individual identifying number. The claims provided a procedure code, indicating the service, along with the provider's Unique Minnesota Provider Identifier and NPI for direct payment to the provider. The claims also identified the medical professional who prescribed or ordered the service, as entered by the provider.

ii. Billing Only After Services Have Been Provided. Providers were required to submit claims to DHS only after covered services were rendered. Providers were not allowed to submit reimbursement claims for services purportedly to be provided at a future time.

## B. The Defendant, Related Individuals, and Related Entities

27. Defendant EMILY RAVITS was a resident of the State of Minnesota until 2023 and then became a resident of the State of Arizona. EMILY RAVITS was licensed by the State of Minnesota as an independent clinical social worker. On or about September 11, 2019, EMILY RAVITS enrolled with DHS as a QSP and, in so

doing, executed a Provider Agreement as well as an EIDBI Assurance Statement for Qualified Supervising Professionals.

28. Co-conspirator 1 was a resident of the State of Ohio who owned, controlled, and operated Provider Agency 1, an EIDBI provider agency operating in the District of Minnesota that enrolled with DHS in or around August 2022.

*Provider Agency 1*

29. On or about June 17, 2022, Co-conspirator 1 and others formed Provider Agency 1 in the State of Minnesota. On or about August 3, 2022, Co-conspirator 1 enrolled Provider Agency 1 in the EIDBI program.

30. On or about May 19, 2023, EMILY RAVITS became formally affiliated with Provider Agency 1.

31. On or about December 28, 2023, Co-conspirator 1 submitted a Disclosure of Ownership and Control Interest of an Entity form to DHS on behalf of Provider Agency 1 that disclosed EMILY RAVITS as a managing employee of Provider Agency 1.

*Other Provider Agencies*

32. In addition to Provider Agency 1, EMILY RAVITS was affiliated with thirteen other EIDBI provider agencies, including up to six other provider agencies during the same time period that she worked for Provider Agency 1.

33. These provider agencies paid EMILY RAVITS in varying amounts, from approximately $1,500 per month to approximately $2,600 per month during the time period of her affiliation with them.

## COUNT 1
## (Conspiracy to Defraud the United States and Make False Statements Relating to Health Care Matters)

34. Paragraphs 1 through 33 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

35. Beginning in or around May 2023, and continuing through in or around April 2026, in the State and District of Minnesota and elsewhere, the defendant,

EMILY RAVITS,

did knowingly and willfully combine, conspire, confederate, and agree with Co-conspirator 1 and others known and unknown to the Grand Jury, to:

a. defraud the United States by cheating the United States government and any of its agencies and departments out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS and CMS, in their administration and oversight of Medicaid, by and through DHS; and

b. violate Title 18, United States Code, Section 1035, that is, in any matter involving a health care benefit program, including Medicaid, to knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact; and make any materially false, fictitious, and fraudulent statement and representation, and make and use any materially false writing and document knowing the same to contain a materially false, fictitious, and

fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services.

**Purpose of the Conspiracy**

36. It was the purpose of the conspiracy for EMILY RAVITS, Co-conspirator 1, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicaid for EIDBI services that were ineligible for reimbursement and not provided; (b) submitting and causing the submission of false and fraudulent representations, pretenses, and promises within ITPs and other forms submitted to DHS; (c) concealing the submission of false and fraudulent claims to DHS, and the receipt and transfer of proceeds of the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of EMILY RAVITS and her co-conspirators, and to further the fraud.

**Manner and Means of the Conspiracy**

37. The manner and means by which EMILY RAVITS and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a. On or about September 11, 2019, EMILY RAVITS executed a Provider Agreement with DHS, agreeing to, *inter alia*, "[c]omply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services" and "[a]ssume full responsibility for the accuracy of claims submitted to DHS."

b. On or about September 11, 2019, EMILY RAVITS executed an "EIDBI Assurance Statement for Qualified Supervising Professionals (QSP)," which stated, "By signing this form, you are assuring that you will take full responsibility for all EIDBI services that are billed under your supervision. You assure that all services under your supervision will be provided by qualified staff working in compliance with all applicable service standards, including standards described in the EIDBI policy manual."

c. In or around September 2019, EMILY RAVITS became affiliated with her first EIDBI provider agency, for which she served as QSP.

d. On or about May 19, 2023, EMILY RAVITS executed an "EIDBI Provider Agency Assurance Statement" with Provider Agency 1, placing her initials next to each of the following three statements: "I understand the QSP qualifications, roles and responsibilities as described in the EIDBI laws and policies;" "I meet the QSP qualifications and will work within my scope of practice and professional licensure;" and "I am employed by the EIDBI agency and aware of my responsibilities and duties as a QSP supervising all EIDBI services provided by an EIDBI agency." EMILY RAVITS re-affirmed these statements by executing another Assurance Statement on or about December 31, 2024.

e. Beginning on or about August 4, 2023, EMILY RAVITS began receiving biweekly payments from Provider Agency 1. Initially, these payments were in the amount of approximately $1,345.98 per month, and the

payments increased to approximately $2,400.00 per month by in or around March 2026.

f. During the course of the scheme, and despite representing to DHS that she would "take full responsibility for all EIDBI services billed under [her] supervision," and "assure that all services under [her] supervision will be provided by qualified staff working in compliance with all applicable service standards," EMILY RAVITS routinely failed to assure that all services under her supervision at Provider Agency 1 were provided by qualified staff working in compliance with all applicable service standards.

g. In her role as a QSP for Provider Agency 1, EMILY RAVITS knowingly and willfully signed ITPs on behalf of Provider Agency 1 for Medicaid recipients: (i) without meeting with the recipients, (ii) without making an independent determination that EIDBI services were medically necessary, and (iii) without making an independent determination that the recipient qualified for the services, as required in order for claims for such services to be eligible for reimbursement by Medicaid.

h. EMILY RAVITS exchanged text messages with Co-conspirator 1, more frequently discussing the timing and amount of payments made to her by Provider Agency 1, as well as EMILY RAVITS' fears of being investigated and prosecuted, than discussing the treatment of recipients.

i. EMILY RAVITS agreed with Co-conspirator 1 not to fulfill the obligations of her role as QSP with knowledge that DHS relied upon her to do

so by, *inter alia*, requiring that a QSP be listed as the treating or supervising provider on claims to Medicaid for EIDBI services submitted by Provider Agency 1.

j. From in or around May 2023 through in or around April 2026, Co-conspirator 1 and others known and unknown to the Grand Jury submitted and caused the submission of false and fraudulent claims to Medicaid on behalf of Provider Agency 1 for EIDBI services that listed EMILY RAVITS as the treating or supervising provider in the approximate amount of $7,767,361, for which Provider Agency 1 was reimbursed approximately $7,472,416. These claims, among other things, (i) inflated the number of EIDBI service hours actually provided; (ii) were for EIDBI services that were never provided; and (iii) were for EIDBI services that were ineligible for reimbursement.

**Overt Acts**

38. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the State and District of Minnesota, the following overt acts, among others:

a. On or about July 27, 2023, EMILY RAVITS sent a text message to Co-conspirator 1 stating, “I need to see what you are billing under my name since I am responsible.”

b. On or about September 8, 2023, Provider Agency 1 submitted an ITP on behalf of Recipient N.A. bearing the signature of EMILY RAVITS.

c. On or about September 10, 2023, Co-conspirator 1 sent EMILY RAVITS a text message stating, "Hi emily [sic] I Just sent you new Itp [sic] signature page. You can docusign or print and sign in ink. The signature page you had sent before is cut and blurry. That's I thought [sic] new one would be better." EMILY RAVITS responded, "Is there a way I can see who the ITP is for."

d. On or about September 10, 2023, Co-conspirator 1 texted a blank ITP signature page signed by EMILY RAVITS to another individual affiliated with Provider Agency 1.

e. On or about September 26, 2023, Co-conspirator 1 sent an email to EMILY RAVITS with the subject line "itp signature page," attaching a file named "individual treatment plan signature page only.pdf," and stating "Hello Emily, the one you signed last time was typed and so they need another one. if [sic] you can just wet sign this one and print your name where it says QSP name and scan back to me that should solve the problem. Thanks."

f. On or about September 26, 2023, EMILY RAVITS sent a text message to Co-conspirator 1, stating: "I just emailed you the signed ITP. I [am] here until Oct 1st I am looking forward to my raise."

g. On or about September 29, 2023, Provider Agency 1 submitted an ITP on behalf of Recipient S.S. bearing the signature of EMILY RAVITS that appeared to be a photocopy of the signature of EMILY RAVITS that appeared on the ITP submitted on behalf of Recipient N.A.

h. On or about October 1, 2023, EMILY RAVITS sent a text message to Co-conspirator 1 stating, "You can send me anything for signing today and tomorrow." Co-conspirator 1 responded, "Will do. I should be fine since I have Signature page for the itp signed. I'll just send you the itps for your review and record."

i. On or about August 8, 2024, EMILY RAVITS sent a text message to Co-conspirator 1 stating, "I don't know how to write itp [sic] but there should be examples."

j. On or about December 23, 2024, EMILY RAVITS sent a text message to Co-Conspirator 1 stating, "I am tightening up in 2025. Those who bill high amounts the Feds are going to move in on quickly."

(Title 18, United States Code, Section 371)

**COUNTS 2-7**
**(False Statements Relating to Health Care Matters)**

39. Paragraphs 1 through 38 of this Indictment are re-alleged and incorporated herein.

40. From in or around May 2023 through in or around April 2026, in the State and District of Minnesota and elsewhere, the defendant, EMILY RAVITS, aided and abetted by, and aiding and abetting, others known and unknown to the Grand Jury, did knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact; and make any materially false, fictitious, and fraudulent statement and representation, and make and use any materially false writing and document knowing the same to contain a materially false, fictitious, and fraudulent

statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission of the following ITPs to Medicaid, through DHS, in order to maintain recipients' eligibility to continue receiving EIDBI services, falsely certifying in each instance that, "[b]ased on the recommendations of the CMDE, it is my opinion as a qualified supervising professional, that this individual treatment plan:" "[a]ddresses the person's needs identified in the CMDE;" "[h]as goals and objectives that are age, developmentally, functionally and culturally appropriate and work toward generalization across the person's natural environments and people;" and "[w]as developed in partnership with caregiver/guardian input," when in fact EMILY RAVITS made no independent determination that EIDBI services were medically necessary and or that the recipient qualified for the services, as required:

| Count | Recipient | Approx. Date of ITP Signature |
|---|---|---|
| 2 | N.A. | March 6, 2024 |
| 3 | A.M. | March 27, 2024 |
| 4 | M.H. | August 15, 2025 |
| 5 | M.A. | September 19, 2025 |
| 6 | Sal.A | December 6, 2025 |
| 7 | Sam.A | December 6, 2025 |

(Title 18, United States Code, Sections 1035 and 2)

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461)**

41. The allegations contained in Counts 1 through 7 of this Indictment are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture against defendant EMILY RAVITS pursuant to the provisions of Title 18,

United States Code, Section 982 and Title 28, United States Code, Section 2461.

42. Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 7 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

43. Money Judgment: Property subject to forfeiture includes, but is not limited to, a forfeiture money judgment equal to total amount of forfeitable proceeds as a result of defendant's violations as alleged in Counts 1 through 7 of this Indictment.

44. Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title 28, United States Code, Section 2461, to seek to forfeit any other property of EMILY RAVITS, up to the value of such property.

A TRUE BILL

UNITED STATES ATTORNEY

FOREPERSON

REBECCA YUAN
ACTING CHIEF
HEALTH CARE FRAUD SECTION
NATIONAL FRAUD ENFORCEMENT DIVISION
UNITED STATES DEPARTMENT OF JUSTICE